**FRANCIS v. FEDERAL RESERVE BANK OF DALLAS.**

No. 2903.

Court of Civil Appeals of Texas. El Paso.
March 1, 1934.

Rehearing Denied March 22, 1934.

G. W. Dunaway, of Midland, for plaintiff in error.

Locke, Locke, Stroud & Randolph, of Dallas, for defendant in error.

PELPHREY, Chief Justice.

On January 1, 1931, John Francis executed to the Citizens' National Bank of Odessa, Tex., his note in the sum of $2,725 payable six months thereafter. The note was given in renewal of another note, besides including a small overdraft and some interest due. Some time thereafter the note was criticized by the bank examiner, and Henry Pegues, president of the bank, requested plaintiff in error to sign the note along with his brother, John Francis. On March 21, 1931, plaintiff in error furnished the bank a financial statement, and it appears that shortly before so doing he signed the note in question. The bank, on March 23d, made application to defendant in error, through its El Paso Branch, to rediscount certain negotiable paper held by it, among them being the note involved in this suit. April 23, 1932, defendant in error filed this suit against both John and A. C. Francis, seeking to recover the principal of, and interest on, the note, together with attorney's fees.

John Francis made no defense, but plaintiff in error filed a general demurrer, a general denial, and specially pleaded that the note was signed by him after its execution by John Francis alone and acceptance by the bank; that he added his name thereto solely as an accommodation to the bank and that such signing by him was without consideration; that the bank was guilty of fraud in the procurement of his signature to the note; and that defendant in error had notice of the defects in the note and lack of his liability thereon. He specially denied that the note was transferred by the bank to defendant in error for a valuable consideration and that defendant in error was a bona fide holder in due course.

The cause was submitted to a jury on two special issues:

"Special Issue No. 1: Do you find from the preponderance of the evidence that at the time Henry Pegues requested the defendant, A. C. Francis, to sign the note in question that Henry Pegues represented to the defendant, A. C. Francis, that A. C. Francis would never be held liable on the note? Answer yes or no.

"Special Issue No. 2.: Do you find from the preponderance of the evidence that at the time the plaintiff, Federal Reserve Bank, accepted the note in question that it had knowledge of any, facts or circumstances that would have caused a reasonably prudent person to make inquiry as to the liability of A. C. Francis upon said note? Answer yes or no."

The jury answered both issues in the negative and, upon such findings, the court rendered judgment against John and A. C. Francis, jointly and severally, for $3,440.25, being $3,127.50 principal and interest, and $312.75 as attorney's fees. A. C. Francis sued out his writ of error to this court.

### Opinion.

Plaintiff in error moved the court for judgment in his favor notwithstanding the verdict on the ground that the issues submitted were immaterial to any issue necessary to a rightful determination of the case; that the undisputed evidence showed that he had signed the note after it had been executed, delivered, and accepted by the bank; that no consideration was given for his signature by the bank; and that defendant in error was not a holder in due course.

The overruling of such motion is made the basis for plaintiff in error's three assignments of error and his two propositions thereunder.

The propositions are:

"First Proposition. The note having been duly executed and accepted by the Citizens National Bank of Odessa, Texas, before plaintiff in error signed the same, and there being no new consideration for plaintiff in error's signature on the note as between the original parties, plaintiff in error could not be held liable thereon."

"Second Proposition. Under the undisputed evidence in this case defendant in error's title to the note was not such that made it a holder in due course and its rights were no greater than the rights of the original payee."

■ It is true that the signature of a person, placed upon a note after its completion and delivery as between the original parties, in order to be effective, must have the support of a new and independent consideration. King v. Wise (Tex. Com. App.) 282 S. W. 570; Central Nat. Bank v. Lawson (Tex. Com. App.) 27 S.W.(2d) 125. But, as said by the Commission of Appeals in King v. Wise, supra, this would not be true where the signature is for the accommodation of the payee and the paper has been further negotiated.

This being true, then a proper decision of the question as to plaintiff in error's liability to defendant in error will depend upon whether or not defendant in error is a holder in due course of the note here sued on and entitled to be protected as such.

■ J. L. Hermann, managing director of the El Paso Branch of the Federal Reserve Bank of Dallas, testified:

"Q. Mr. Hermann, when did the Federal Reserve Bank acquire this note? A. It was sent to us in an application for Odessa dated the 21st of March. We received it on the 23rd of March and credited it to the account of the Citizens National Bank on the 31st of March.

"Q. What was the consideration, if any, paid for that note? * * * A. We credited the account of the Citizens National Bank of Odessa, Texas, with $2725.00, less three and one-half per cent discount for ninety-two days.

"Q. Did you credit them with twenty-seven hundred dollars and some odd cents? A. Yes, sir.

"Q. Was that the standard rate at which you purchase notes? A. Yes, that is the standard rate at which we purchase at all times, or at that time.

"Q. How did you make payment to the Citizen's National Bank for that note? A. The Citizens National Bank carries an account with us on their books and the amount was credited to them for this note, together with five other notes on the 31st of March, the total credit being $6751.20.

"Q. Do you or not, by saying 'credited to the account,' mean you gave them credit on your books as having that much money in the bank, the same as if I would make a deposit in the Citizen's National Bank and they gave me credit for what I deposited? A. Yes, their account was increased by that amount.

"Q. Could they have drawn on that account? A. Yes, they did draw on it the same day. * * *

"Q. You gave them credit on March 31st for that? A. Yes.

"Q. It (meaning the Citizens National Bank) closed its doors about ten days later, didn't it? A. I think it was the 14th of April.

"Q. How much account did it have with the Federal Reserve at the time it closed its doors on the 14th of April? A. I didn't bring the account past the 31st of March and do not remember.

"Q. From your general knowledge of the situation, do you know approximately what

the amount of its balance was? A. I can tell you the balance on the 31st. That is the last I have.

"Q. What was it? A. $24,776.32. * * *

"Q. Do you say the note came to you with an application? A. Yes, sir.

"Q. Do you have that application? A. Yes, sir.

"Q. Where is it? State whether or not that (indicating) is the application that accompanied that note? A. Yes, this is the application from the bank on which the note was listed.

"Q. And this particular note is listed among the notes on that list? A. Yes. * * *

"Q. Whatever amount of credit you had on hand at the time the Citizens National Bank closed its doors you retained that, didn't you? A. You mean immediately? Do you mean up to now, or what? I don't understand your question.

"Q. Assuming they had not drawn anything, they would have about $24,000.00 credit when they closed their doors a few days later and its credit was $24,000. Now, if they had a credit on their books at the time they closed their doors, you didn't pay it to them, did you? A. Do you mean after the receiver had taken it over?

"Q. Yes. A. I don't know whether the Receiver took it or not, or whether it was turned over to the Receiver or not. I may state we are a branch of the Federal Reserve Bank of Dallas and, if a bank in our territory becomes insolvent, the papers are then and all records are immediately turned into our head office and the transactions are handled from then on at the head office. We simply handle transactions with the banks that are going institutions.

"Q. It is also a custom that the Federal Reserve Bank follows when a bank closes its doors and has on hand a credit with you of so much money, that you hold the deposit until all obligations to the Federal Reserve Bank have been paid. Isn't that true? A. Not necessarily, no.

"Q. You could do it, couldn't you? There is no law or rule or custom to prevent you from doing it, is there? A. I am not familiar enough with the law to tell whether we legally could or not. Sometimes we leave certain amounts and sometimes we don't.

"Q. That deposit remains there, doesn't it, until all affairs between you and the liquidation agent have been settled? A. Not necessarily. * * *

"Q. These notes that you have mentioned here, do you say they were received at your bank on the 23rd of March? A. Yes.

"Q. But you didn't pass them for credit until the 31st of March? A. That is right.

"Q. Do you know what caused the lapse of time in there? A. I don't know positively. I can give you one or two probable reasons,— but I don't remember positively in this case.

"Q. All right, what was that? A. One reason would be, banks frequently send us notes to approve and hold until the dates they need them. Other times they send us notes and will send us out collateral to protect their endorsement, and if the collateral to protect their endorsement on the original notes we purchase does not come along in time we hold up the credit and it could be either of those two reasons.

"Q. At that particular time when these notes were transferred to you, I will ask you if it isn't a fact the Federal Reserve Bank at that time was relying on additional collateral to rediscount the notes? A. Yes, sir.

"Q. At what percent? A. Twenty-five.

"Q. Was additional collateral sent along with this batch of notes listed in that contract? A. Let me see the application. It might show (Exhibit 'A' is handed the witness). No, from the Application it indicates we passed on the acceptability of the notes but withheld credit waiting the additional collateral. * * *

"Q. Do you have a form of contract that is entered into when you do take additional collateral? A. Yes.

"Q. Do you have that in this instance—the contract that was entered into? A. I haven't it with me, no. * * *

"Q. Anyway, that collateral contract provides that you may hold these additional collateral notes to satisfy any balance that you may fail to collect on the rediscount notes, doesn't it? A. I don't remember the wording of it.

"Q. Do you know what your custom is with reference to it? For instance, in this batch of notes at the time you took the note the suit is about you required additional collateral notes. In the event all of this batch of notes should be paid, what would you do with these collateral notes? A. Do you mean you want me to state what we would have done if these had been paid?

"Q. Yes. A. If the Citizens National Bank had paid us off, had redeemed all the notes we had rediscounted and that obligation to us as endorser, we would have returned the additional collateral to the Citizens. * * *

"Q. In the event you collect this note, it would release the collateral security, wouldn't it? A. There is no particular collateral against this note but on the endorsement. * * *

"Q. All the money you paid for this note, or everything you paid of value for it, was to augment the credit to the Federal Reserve Bank, wasn't it? A. Yes, that is the only way we had of paying for anything with a member bank. •

"Q. This money that was credited to the account—deposited to the account of the Citizens National Bank was actually checked out by the Citizens National Bank of Odessa, wasn't it, Mr. Hermann?

"Q. Does that (indicating) show it was checked out by the statement you have there? A. This credit for this note and the other five notes increased their balance by $6751.20 and on the same day they drew drafts against the account of $9899.95.

"Q. This entire amount that was credited to the account of the Citizens National Bank of Odessa could have been checked out by that Bank, couldn't it? A. Well, the draft checked out that and some more of the balance they previously had.

"Q. They could have checked out all of it, couldn't they? A. Yes.

"Q. There was no rule to keep them from withdrawing all of it? A. No. •

"Q. Just the same as a depositor putting money in the bank and drawing a check against it. Isn't that correct? A. Yes.

"Q. Mr. Hermann, what was the balance to their account at the close of business that day they got credit for the notes? A. $24,-776.32. * * *

"Q. Whatever drafts they might have drawn that day .didn't bring their balance down to the amount of these notes. That is, they had, in addition to the credit they got on the notes on that particular day, they still had other credit? A. Yes, they had a balance from the previous day.

"Q. Mr. Hermann, I will ask you if the form that has been introduced here that was used in sending in these notes for rediscount is not identically the same form as that used when the notes are sent in with additional collateral, with the exception of the line— the blank here (indicating) that is filled in? A. Yes, the printed form is the same.

"Q. What line is filled in definitely? A. The purpose for which this offering is submitted, whatever is put in after that, explains whether it is sent in to sell to us or is additional collateral.

"Q. The form you had would be the same as this, except with the line filled in definitely? A. Yes, sir.

"Q. Speaking of that form, Mr. Hermann, is any of that collateral listed to any particular note, or is it a collateral deposited with you or indebtedness deposited with you to secure you on the endorsement of the Citizens National Bank at Odessa? A. It is collateral for any indebtedness or liability that the Citizens National may have to us, but not any particular item. It could be against an overdraft or any business transaction with this bank.

"Q. And is it to secure the endorsement or the signatures of a maker or any party to any note other than the Citizens that tenders it to you? A. It is security to protect, to further secure the endorsement of the bank on the various obligations they have with us.

"Q. Mr. Hermann, when this note of suit was tendered to the Federal Reserve Bank, was any instrument or collateral attached to the note itself? A. No, sir."

Mr. Pegues testified, relative to the transfer of the note to defendant in error, as follows:

"Q. Did you ever tell the Federal Reserve Bank of Dallas at the time you presented this note to them to sell it to them that Mr. A. C. Francis' signature wasn't binding on that note? A. No, I didn't tell them that.

"Q. You didn't tell them anything about the circumstances of his signature? A. I don't remember discussing it."

Mr. Lynch, receiver of the bank, testified that the bank's balance with defendant in error at the time the bank closed was less than $2,600.

We have quoted extensively from the testimony because of certain contentions advanced by the plaintiff in error. They are: (1) That the course of dealing between the parties brings into play the provisions of our statutes relative to restrictive endorsements; (2) that the Federal Reserve Bank held the note in question merely as agent or trustee for the Citizens' Bank; and (3) that no money was paid by the Federal Reserve Bank for the note.

Article 5935 (Rev. St.) defines a "holder in due course" to be one who has taken the instrument under the following conditions:

"1. That it is complete and regular upon its face;

"2. That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;

"3. That he took it in good faith and for value;

"4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

In our opinion, the facts, as disclosed by the testimony set forth above, are sufficient to show defendant in error to be a holder in due course under the above provisions, and, therefore, not subject to the defenses which are attempted to be interposed here.

The statement of plaintiff in error in his brief that: "The custom was when a note would come due it would be returned to the Citizens National Bank for collection and other notes be substituted in its place. At any time it could charge the note back to the Citizens National Bank and reduce its balance to that extent. It never paid a cent for the note and never could be held to have any investment in it unless on a final adjustment of accounts when all the notes held by the Federal Reserve Bank were collected or charged off there was a balance still owing, and there is no evidence in the record that indicates a situation of that kind exists or could ever exist," is not borne out by the record here.

The trial court correctly overruled plaintiff in error's motion for judgment non obstante veredicto, and its judgment is in all things affirmed.